NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0879-10T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

WEDPENS DORSAINVIL,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

May 2, 2014

APPELLATE DIVISION

Submitted October 2, 2013 — Decided May 2, 2014

Before Judges Fuentes, Fasciale and Haas.

On appeal from Superior Court of New Jersey, Law Division, Union County, Indictment No. 07-11-1010.

Joseph E. Krakora, Public Defender, attorney for appellant (Karen E. Truncale, Assistant Deputy Public Defender, of counsel and on the brief).

John J. Hoffman, Acting Attorney General, attorney for respondent (Jennifer E. Kmieciak, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Defendant Wedpens Dorsainvil was indicted by a Union County Grand Jury and charged with first degree murder of Jamillah Payne, N.J.S.A. 2C:11-3a(1), (2); first degree conspiracy to

commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3; first degree attempted murder of Khalid Walker,[1] N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(c); third degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); second degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); third degree conspiracy to distribute cocaine and/or heroin, N.J.S.A. 2C:5-2, N.J.S.A. 2C:35-5(a)(1), and N.J.S.A. 2C:35-5(b)(3); and second degree possession of a firearm during the commission of a drug-related offense, N.J.S.A. 2C:39-4.1(a).[2]

Tried before a jury over a period of eight days, defendant was found guilty of first degree conspiracy to murder Payne,[3] second degree aggravated assault of Walker, as a lesser-included offense of first degree attempted murder, second degree possession of a firearm for an unlawful purpose, second degree

---

[1] The indictment initially listed Jamillah Payne as the victim of this crime. The court amended the indictment once the error was detected.

[2] Phillipe Barthelus was charged as a co-defendant with committing the same crimes. Barthelus was tried separately and convicted on all of the charges. The trial court sentenced Barthelus to an aggregate term of forty-five years, with an eighty-five percent period of parole ineligibility and five years of parole supervisions as required under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. We affirmed the conviction and sentence on direct appeal in an unpublished opinion. State v. Barthelus, No. A-5012-10 (App. Div. Oct. 11, 2013).

[3] Despite this finding of culpability on the conspiracy charge, the jury found defendant not guilty of murdering Payne.

possession of a firearm during the commission of drug-related offense, third degree unlawful possession of a weapon, and third degree conspiracy to distribute cocaine and/or heroin.

The trial court sentenced defendant to an aggregate term of forty-five years, subject to the eighty-five percent parole ineligibility restriction and subsequent five-year period of parole supervision mandated by NERA. We have opted not to describe in detail the analysis employed by the trial court to arrive at this aggregate sentence because we are satisfied defendant's conviction cannot stand.

Our decision to set aside defendant's conviction is predicated on two interconnected events. The first concerns a physical altercation between two deliberating jurors that occurred during jury deliberations. Physical violence between jurors during deliberations is toxic to the environment of rational discourse we associate with the deliberative process and fundamentally inconsistent with any notion of ordered liberty. A jury verdict contaminated by such violence is inherently unreliable. The trial court thus committed reversible error in denying defendant's motion for mistrial.

Independent of this error, the coercive measures employed by the trial judge in an attempt to preserve the integrity of the deliberative process were not only ineffective but, in our

view, exacerbated the menacing environment caused by the violent episode between the two jurors. No reasonable juror can be expected to perform his or her duties as impartial judges of the evidence adduced at trial under the sweeping court-ordered civility code imposed by the trial court in this case.

We derive the following facts from the record developed before the court, including the evidence presented to the jury at trial.

I

CORE OF OPERATIVE FACTS

A

From the State's perspective, this case is about the dangers associated with the business of illicit drug trafficking at the retail level. Jamillah Payne, the nineteen-year-old woman whom the State alleged was shot and killed by defendant and then thrown out of her own fourth-floor apartment window by his co-defendant, was actually part of defendant's own "crew" or drug distribution operation. Payne allowed defendant to use her apartment as a storage and local distribution site and assisted him in packaging the drugs for street-level distribution. As the prosecutor acknowledged in his opening statement to the jury, "Jamillah Payne was part of the drug conspiracy."

In order to provide the jury with an explanation for the events that led to Payne's death, the State called as a witness a man who had been incarcerated with defendant in the Union County jail in 2007 before this case went to trial.[4] This witness also knew Payne socially, independent of defendant, as "his ex-girlfriend's cousin." According to this witness, defendant told him he was upset with Payne because she was using the apartment as her residence with her son and for other social activities unrelated to the apartment's dedicated purpose as a place to store, package, and distribute illicit narcotics.

More importantly as it relates to this case, the witness said defendant also believed Payne was "hanging around with, basically, her gang member friends, Bloods,[5] if you want to call

---

[4] In response to the prosecutor's questions on direct examination, the witness acknowledged he had previously pled guilty to first degree distribution of heroin and cocaine. He was sentenced to a term of six years with two years of parole ineligibility, which is a sentence within the range of a second degree offense, in exchange for agreeing to testify "truthfully" as a witness for the State in this case.

[5] The "Bloods" is a criminal gang described by the New Jersey State Police as a franchise with numerous smaller gangs taking the "brand name" of the gang and adopting the gang's symbols, ideology and terminology. The extent to which Bloods "sets" cooperate with each other or respect territory, members or financial resources varies widely, with the result that open competition and conflict between Bloods "sets" (or among local factions of the same set) is not uncommon. See New Jersey Department of Law & Public Safety Division of State Police, Intelligence Section, Gangs in New Jersey: Municipal Law

(continued)

it."  The witness claimed defendant was particularly troubled by Payne's association with Khalid Walker, who defendant believed may have previously broken into the apartment with other gang members "and stolen some money and some drugs."  Defendant told the witness he wanted to change the locks in the apartment "to avoid all situations."  In response to the prosecutor's question as to whether defendant "actually . . . beg[a]n to change the locks in the apartment at some point," the witness testified: "Yes . . . [t]he same night all hell broke loose, if you want to call it Jamillah [Payne's] death, let's say."

Thus, under the State's theory of events, Payne's untimely death was the result of conflicts between local drug "crews" operating in the same apartment building and sharing the same territory.  Payne unintentionally set in motion the chain of events that caused her death by socializing with rival gang members and raising defendant's suspicions by using the apartment as an actual residence, not just a drug warehouse.

The first link of this chain was forged when Payne phoned W.S.[6] on the evening of July 13, 2006, and asked him to come to

_____

(continued)
Enforcement Response to the 2010 NJSP Survey 26, 52 (2010), http://www.njsp.org/info/pdf/gangs_in_nj_2010.pdf.

[6] We use initials in referring to witnesses and other individuals related to this case to protect their privacy.

A-0879-10T2

her fourth-floor apartment. W.S. was a member of the "Bloods," and operated a rival illicit drug crew in an apartment located on the third floor in the same building. He testified Payne sounded "disturbed" when she spoke to him on the phone that evening. According to W.S., when he arrived, Payne, defendant, and four other men were already in the apartment.[7] Payne did not respond to W.S.'s inquiries about what prompted her to ask him to come to the apartment. W.S. testified that at some point shortly after his arrival, defendant went into the kitchen area of the apartment and quickly returned with a handgun in his hand. Defendant then fired one shot into the floor.

As a reflexive action, presumably based on an instinctive reaction or as a last desperate measure to avoid being shot, W.S. jumped out of one of the windows of Payne's fourth-floor apartment; he fractured his pelvis, punctured a lung, and fractured a hand. W.S. heard three more gunshots while on the ground. He thereafter saw Payne plunge from one of the windows of the apartment. We note W.S.'s perception of events may have also been impaired by other factors in addition to his injuries.

---

[7] W.S. gave inconsistent accounts about what he saw when he first arrived at Payne's apartment. Initially, he did not identify defendant as being inside the apartment that night. He later explained that he lied because he was "afraid for [his] life."

A-0879-10T2

Specifically, W.S. testified he was under the influence of alcohol and illicit narcotics at the time.

The State called as witnesses a number of other individuals who were also in the apartment building on the night of the shooting. D.K. testified he saw Payne "hanging from a window," and saw Barthelus push Payne out of her apartment window. On cross-examination, however, D.K. conceded to giving conflicting accounts of what he saw regarding the incident. Although he testified at trial to seeing Barthelus's face as he pushed Payne out of the window, he had previously stated he did not see Barthelus's face that night and was only able to identify him by the unique marks on his arms.

M.M. was also a resident of the building where Payne had her fourth-floor apartment. M.M. testified to hearing multiple gunshots, "loud noises and flashes, and a lot of commotion" on the evening of July 13, 2006. She saw a number of individuals running down the building's fire escape. M.M. identified Barthelus as one of the individuals she saw run down the fire escape and head toward her apartment.

## B

Khalid Walker, a man identified by the State's jail house informant as "a high ranking member" of the rival crew that intended to move into the fourth-floor apartment, was inside

Payne's apartment on the night of the shooting and was himself shot in one of his legs. His testimony proved to be problematic, however, because by the time this matter reached trial, Walker had recanted his previous statements and was unwilling to cooperate with the State. Making matters even more difficult, Walker, who was at the time serving a sentence in State prison on an unrelated matter, refused to wear the civilian attire provided to him by the State and insisted on taking the stand as a witness wearing his inmate garb.

Defense counsel did not object to Walker testifying while wearing his inmate uniform; she believed Walker's attire would likely undermine his credibility as a witness for the State because it would provide the jury with visual evidence of his past criminal transgressions. After discussing the matter with the attorneys in the case, the trial judge decided to permit Walker to testify wearing prison garb.[8]

_____

[8] In reaching this decision, the judge specifically noted State v. Kuchera, 198 N.J. 482, 486 (2009), in which the Court held that a prosecution witness who testifies in prison garb "likely does not affect" the fairness of the trial "as a whole." However, consistent with the reasons that animated the Court's decision in State v. Artwell, 177 N.J. 526 (2003), "unless otherwise permitted by the trial court in the exercise of its discretion, witnesses in criminal cases -- both for the prosecution and for the defense -- should not testify in prison garb." Kuchera, supra, 198 N.J. at 486.

A-0879-10T2

Despite this accommodation by the court, Walker refused to testify. The record reflects the judge explained to Walker the consequences of his refusal to testify outside the presence of the jury. Specifically, the judge apprised Walker that he would be held in contempt, remanded to the county jail until compliant, and the time spent in the county jail on the contempt citation would not be credited to his unrelated State prison sentence. After this explanation, the prosecutor asked Walker a series of basic questions to lay the foundation for his trial testimony. Walker's answers were either unresponsive or clearly indicative of his continued refusal to testify.

After further discussion with the attorneys, the judge once again engaged Walker directly. The judge again made clear the consequences of his behavior. When Walker made clear his willingness to remain defiant, the judge held him in contempt. The judge again emphasized to Walker he would remain in the county jail "until you testify under oath." After some reflection and interaction with the judge, Walker acceded.

Walker testified that on the night of the incident, he was shot in the leg while he was in the bathroom talking on his cell phone. He did not know who shot him. Police records show that Walker stated individuals in the apartment were arguing about drugs and that "Cam" (a nickname used for defendant) had shot

10

him.  Walker also provided the police with a description of his assailant.  At trial, Walker testified that none of the information he provided to the police in 2006 was correct and claimed the police "coerced" him into giving a statement.  After considering the relevant standards and applicable legal principles,[9] the trial judge granted the State's motion to play to the jury the videotaped statement Walker gave the police in 2006 as a prior inconsistent statement.

<u>C</u>

City of Elizabeth Police Officer William Deegan was one of the officers who responded to the shooting incident that night.  Immediately upon his arrival, Deegan saw a woman, later identified as Payne, lying dead on the sidewalk.[10]  He was compelled to use force to enter apartment 4H because the door was locked.  Deegan described the interior of apartment 4H as "barren," with "blood on the right-hand side of the wall by the

---

[9] Applying the standards endorsed by the Court in <u>State v. Brown</u>, 138 <u>N.J.</u> 481, 543-45 (1994), the trial judge found Walker's claim of a "lapse of memory" concerning the circumstances that led the police investigators to videotape his statement was feigned and tantamount to an implicit denial of his prior statements.  The judge thus admitted the videotaped statement as a prior inconsistent statement under <u>N.J.R.E.</u> 803(a)(1)and (3). <u>See also</u> <u>State v. Gross</u>, 121 <u>N.J.</u> 1, 10 (1990).

[10] The Union County medical examiner testified as an expert in forensic pathology.  He classified Payne's cause of death as a homicide. She died from a single gunshot wound to the chest. Payne also had injuries consistent with being pistol whipped.

doorway." He also entered apartment 4A, the next apartment over from 4H, and observed that the screen looked forced in, and there was blood on the counter, the door, and a set of keys he found on the floor.

Forensic investigators who processed the crime scene in Payne's apartment recovered three pieces of ballistic evidence in the form of a spent casing found in the kitchen, and two projectiles — one found in the bathroom and one in the "mid-room." Detective Gary Mayer was admitted by the court as an expert in field of forensic ballistics. Mayer classified the spent projectiles as .38 caliber and the spent casing as discarded by a .25 caliber round.

R.G., her daughter, and G., the child's father, resided in another fourth-floor apartment located in the same building. All three were home on the night of July 13, 2006. R.G. testified that the child's father was addicted to heroin and had used heroin that night. G. had been incarcerated on past occasions due to his addiction and related problems.

R.G. found herself "in a really, really financial bind" during the times G. had been detained. In a misguided attempt to ameliorate her financial problems, R.G. worked for defendant during her difficult times by holding his drugs in her apartment and packaging the drugs for retail sale. Her involvement was

limited to handing the drugs to other "guys" who "would come or call."

According to R.G., defendant called her at approximately ten o'clock in the evening on the night of the shooting and asked her to open the door. She heard "a lot of commotion" as she approached to open the door. She described defendant as "very scattered, like, out of breath, like nerves, and he wanted to come in, and he had blood on his shirt" when she opened the door. Defendant also "had guns with him." When R.G. asked him what happened, defendant allegedly responded: "I had to do it. I had to do it." Pressed by R.G. to elaborate on what he meant by "it," defendant responded: "Milla," meaning Jamillah [Payne] . . . . I had to do it." R.G. testified defendant told her Payne "knew too much and that if it didn't go down that way that she would have took (sic) everybody down." Defendant was not visibly injured.

R.G. gave defendant "a blue shirt and jeans" for a change of clothes and "discarded" what he was wearing. R.G. also saw defendant "discard" two guns he placed on her kitchen table by wrapping them in a garbage bag and placing them inside R.G.'s garbage can. She threw the garbage bags away on her way to a restaurant. R.G. gave a statement to police on June 6, 2007,

13                                                              A-0879-10T2

and identified defendant as the person who had come to her apartment on the night of July 13, 2006.

Defendant also called S.W. on the night of the shooting. S.W. had known defendant for approximately six years and knew he kept drugs at Payne's apartment. S.W., as a witness for the State, said defendant told her to go to his house and "get rid of anything that didn't belong there." She removed his Social Security card and identification documents from his home.

S.W. and defendant bought a Jeep Cherokee from a used car lot early the next morning. S.W. put the title to the car in her name. After buying some "stuff for the car" and getting a tune-up, defendant, S.W., Barthelus, and two other individuals drove out of New Jersey on their way to Georgia. According to S.W., defendant did not have any extra clothes with him, and the other passengers did not have big suitcases.

On the morning of July 15, 2006, South Carolina Police Officer Brock Horton stopped a 1998 Jeep Cherokee with temporary New Jersey plates on Interstate 95. The vehicle was travelling at approximately ninety-two miles per hour, which was above the local speed limit. The parties stipulated at trial that defendant was a passenger in the vehicle and intentionally misidentified himself as "Ken Mathews." The driver and the other men in the car were unable to provide Horton with

14                                                         A-0879-10T2

appropriate identification.  Horton identified defendant as a passenger in the vehicle he stopped.  Co-defendant Barthelus was also in the car at the time of the stop.

II

JURY DELIBERATIONS

After the alternate jurors were selected and segregated, the jury began deliberating sometime in the afternoon of July 8, 2009.  The court received the first note or question from the jury later that afternoon.  Although the record does not reflect any other communication from the jury before this one, the trial judge marked this note "C-10."[11]  As read into the record by the judge, the jury asked for

> clarification regarding Page 45 of the charge.  Does this page, act of a co-conspirator, apply to only the conspiracy to commit the murder of Jamillah Payne charge but does Page 45 also apply to the other charges, including the murder charge?

The record before us shows the judge responded to the jury's query in C-10 without first consulting with the attorneys to

---

[11] Following the customary practice of identifying written communications from the jury as "C" exhibits, C-10 implies there were nine other previous notes or questions from the jury that were not marked into evidence or otherwise identified for the record.  The quality of appellate review depends upon a complete and accurate record of the proceedings before the trial court.  The trial judge is responsible to ensure that all written communications from the jury are properly identified and preserved for appellate review.

obtain their input and determine whether they had any objections to the manner the court responded to the question.

The next communication from the jury, marked C-11, was also sent on the afternoon of the first day of deliberations. As read into the record by the judge, C-11 stated:

> "According to Page 45,[12] if a person is legally accountable for the conduct of another person" -- then they are saying, "including murder" -- that is a reference to my prior instruction to them, "when he's engaged in a conspiracy, does this mean the person is accountable or guilty of murder"?

In contrast to the manner in which the judge proceeded in responding to the question raised in C-10, the record shows the judge ultimately responded to the question in C-11 after he solicited comments and suggestions from the attorneys outside the presence of the jury and considered their concerns. Because it was almost 4:00 p.m. by the time the jurors' question was addressed, the judge decided to excuse the jury for the day. The judge instructed the jurors not to discuss the case with anyone and not to resume deliberations until they were all together the following morning at nine o'clock.

---

[12] As authorized by Rule 1:8-8(a), the judge provided the jury with copies of the legal instructions and permitted the jurors to take copies of the instructions with them to the jury room during deliberations.

Although technically the second day of deliberations, July 9, 2009 was actually the first time the jurors had a full day to deliberate. Shortly after the jury began deliberating that morning, the judge acknowledged the receipt of a note from Juror 16, which the court marked C-13. As read by the judge, the note indicated Juror 16 had "scheduled vacation for 7/10/09. So I would be grateful if I can be excused from the jury." Because the attorneys were not yet present, the judge told Juror 16 he would discuss the issue with the lawyers and directed him to return to the jury room and resume deliberations until otherwise instructed by the court.

Defense counsel was the first attorney to comment on this issue. She noted that Juror 16 did not mention anything about a possible vacation conflict during voir dire. Both the judge and the prosecutor concurred with defense counsel on this point. The prosecutor noted, however, that based on what was said to the prospective jurors during voir dire about the possible length of the trial, it was reasonable for Juror 16 to have expected the trial to have ended the previous week. The judge nevertheless emphasized that it was clear from the manner in which the case progressed that the case would continue beyond the previous week.

The judge was particularly concerned about Juror 16's ability to consider the evidence carefully and fairly. As the judge noted, "[s]uppose he says, 'I'm leaving. I have a prepaid vacation with my whole family and I should be home packing, doing this, that. I can't concentrate, I can't focus.'" Without objection from counsel, the judge brought Juror 16 back to the courtroom to inquire further about his vacation plans.

In response to the judge's request to explain "a little more," Juror 16 said: "I'm going away on vacation tomorrow . . . [to the] Bahamas." The judge then asked the juror whether "that, in any way, interfere with your deliberating today?" Juror 16 answered: "No." The judge nevertheless persisted:

> THE COURT: But I want to make clear what is in that question, and that is, you are going to be able to stay focused and concentrate and not, in any way, feel rushed?
>
> JUROR [16]: No.

After conferring with counsel at sidebar, the judge directed Juror 16 to return to the jury room and stated: "[W]e'll deal with it in the afternoon, if necessary."

### Violence In The Jury Room

At 2:27 p.m. on July 9, 2009, the judge received another written communication from the jury. We pause here to note that the record reflects the judge did not discuss the jury's note with the attorneys before deciding to take this course of

18

action.  The judge brought the jury into the courtroom and made the following statement:

> THE COURT:  I'm going to read the note[13] you sent me for the benefit of the alternates. The note reads, "<u>Your Honor, at this point the jury is hopelessly deadlocked.  The jury is finding it impossible to make further progress to make a unanimous decision on any Count</u>."
>
> I'm, basically, going to ask you to go in and try again.  I would -- I'm going to read to you from Page 71 and 72 of the jury instructions.
>
> [(Emphasis added).]

The judge then reread to the jury the section of the standard model charge on "deliberations," which, inter alia, admonishes each juror to consider the evidence impartially and deliberate "with a view to reaching an agreement, if you can do so without violence to individual judgment."  After reading this two-paragraph long statement, the judge addressed the jury as follows:

> So what I'm asking you to do is go back into the jury room, reexamine your positions, listen to what the other jurors have to say, and give it another try.  All right?  I'm

---

[13] This note from the jury announcing the inability to reach a unanimous verdict was not identified by the judge with the customary "C" exhibit designation.  The failure to identify for the record a written communication from the jury is not a trivial oversight.  This kind of omission needlessly makes the appellate process more difficult and time consuming.

A-0879-10T2

asking you deliberating jurors to go back in the jury room.

The entire event took three minutes, including the time consumed by the judge reading the jury's note announcing it was "hopelessly deadlocked."

After the jury left the courtroom, the judge asked a Sheriff's Officer the following questions:

> THE COURT: Sergeant, I want you to describe for the record what you observed, what you heard, and what happened.
>
> THE SHERIFF'S OFFICER: There was a knock on the door. Officer Karlick (Phonetic) entered the jury room ahead of me. I believe one of the jurors -- I'm not sure who it was -- handed him a note.[14] There was a heated argument between two jurors. I asked them to please just sit down, calm down. The argument escalated.
>
> One of the jurors, I believe it was the young lady -- one of the jurors sitting outside wanted to go for a cigarette. It sounded like a good idea because she was one of the parties involved in this argument.
>
> In the best interests -- in the interests of all these women, I told Officer Karlick to take them for a cigarette, and then the other jurors sat down.
>
> It was a heated, heated argument. They were both standing up.

---

[14] Because the trial court did not mark this note as "C" exhibit, nor read what it said into the record, we are unable to determine its significance.

THE COURT: <u>This is the note that I have. We don't know who wrote it</u>.[15]

THE SHERIFF'S OFFICER: <u>The two jurors are still sitting outside</u>.

THE COURT: <u>Have those two jurors go back in</u>.

[(Emphasis added).]

All twelve jurors returned to the jury room without any instructions from the court as to whether they should resume deliberations. At this point, the judge addressed the attorneys on the record about how he planned to respond to the report of a "heated argument" between two deliberating jurors.

> THE COURT: I propose the following: Bring the jurors out, tell them that I want them to fully deliberate and fully discuss any and all issues that they think are to be discussed, but they are to treat each other with respect and courtesy, and send them back to continue deliberating.
>
> Anybody want to be heard on that?
>
> I'm also -- I've also told the Sheriff's Officers that they are not to go into the jury room to collect a note, or something like that, unless they come to me, first.
>
> [DEFENSE COUNSEL]: Yes, Judge.
>
> THE COURT: My proposal acceptable to everybody?
>
> [PROSECUTOR]: Yes, your Honor.

---

[15] Again we are compelled to highlight the court's failure to identify this "note" as a "C" exhibit with a corresponding number.

21                                    A-0879-10T2

[DEFENSE COUNSEL]:  Does the Court -- <u>the Court is not going to inquire as to who wrote the note, or it doesn't matter</u>?

THE COURT:  I wasn't -- well, you know, <u>there was a heated discussion going on and -- I wasn't going to inquire because, you know, I'm concerned about inquiring into the deliberative process and what people are thinking about . . . but I'm willing to listen to suggestions to the contrary</u>, but my feeling is what they need to be told is they should fully discuss everything that they think needs to be discussed here, but they should treat each other with respect and courtesy, and listen to what everyone has to say, and in a respectful manner, and proceed in that kind of way.

[DEFENSE COUNSEL]:  Your Honor, I would only ask -- I know the Court did it before -- is the Court inclined to give the modified <u>Allen</u>[16] charge, again?

THE COURT:  They have not come back -- you know, first of all, they have it in the charge, I charged it to them originally. They have the written document.  I referred it to them again, and I read it to them. I'm not sure that is the issue at this point in time.

[DEFENSE COUNSEL]:  Okay.

[(Emphasis added).]

In response to the judge's question, the Sheriff's Officer indicated that the argument appeared to involve a personal disagreement between the jurors "rather than a substantive

---

[16] <u>Allen v. United States</u>, 164 <u>U.S.</u> 492, 17 <u>S. Ct.</u> 154, 41 <u>L. Ed.</u> 528 (1896).

discussion about the issues of the trial." The judge did not ask the Officer to elaborate on this characterization. Following this interaction with the Sheriff's Officer, the judge brought the jury back to the courtroom, had them line "up along the back[,]" and again instructed them on the need to be respectful to one another. The judge emphasized that this did not mean "you can't strongly disagree, but you need to treat each other in a respectful and courteous way." The record shows in was 3:36 p.m. when the jury returned to deliberate.

Sometime thereafter, the jury sent out a note (again not marked as a "C" exhibit), which read: "Your Honor, we would like to stop today at 4:30 [p.m.]." This prompted the judge to bring to the attorneys' attention the need to address Juror 16's vacation plans. However, as the judge himself noted, he was distracted by the "argument" between the two deliberating jurors, who the judge identified for the record as Jurors 7 and 8. With the consent of the attorneys, the judge decided to create a record of what the Sheriff's Officer actually saw and heard concerning the "heated argument" between these two jurors.

> THE COURT: [Addressing the Sheriff's Officer] Were you there.
>
> THE SHERIFF'S OFFICER: I was there.
>
> THE COURT: Maybe I don't need him.

THE SHERIFF'S OFFICER: Officer Karlick, Sheriff's Department. Loud knocking on the jury door.

THE COURT: This is after the note[17] came?

THE SHERIFF'S OFFICER: Correct. Less than a minute later a lot of knocking on the door. We go in. <u>An argument between three parties</u>, separated the parties, brought Juror Number 7 outside and --

THE COURT: When you say "arguing" --

THE SHERIFF'S OFFICER: Verbally. <u>Juror Number 7 said somebody tried to take her in the bathroom and wanted to fight her in the bathroom -- 8, sorry.</u>

<u>At that time we separated the parties, brought Juror Number 8 out, and everybody else on the jury was getting along, so we shut the door and left them.</u>

THE COURT: All right.

THE SHERIFF'S OFFICER: I'm sure of the numbers of the other jurors.

THE COURT: Now, suppose -- let's say [Juror 16] says he can't deliberate tomorrow because he's leaving -- let's say he has prepaid vacation. Right?

THE SHERIFF'S OFFICER: Judge, this Officer -- I believe Officer Swick should address both parties present about what happened.

THE COURT: Is anybody talking to the lady outside?

---

[17] We infer the "note" mentioned by the judge here is the note announcing the jury was "hopelessly deadlocked."

THE SHERIFF'S OFFICER: <u>She is sitting there by herself</u>.

THE COURT:  Go ahead.

THE SHERIFF'S OFFICER: I was the first person in the back and when I got there they were separated.  And then the lady, I don't know what juror [number] she is, I guess 8, was the one outside.

THE COURT: I think she is Number 8, but we will find out in a minute.

THE SHERIFF'S OFFICER: <u>She said that she slapped her</u> and then the lady, I guess  -- I don't know.  What lady in the pink shirt?

THE COURT:  Juror Number 8 said somebody slapped her.

THE SHERIFF'S OFFICER: <u>The juror with the pink shirt slapped her</u>.

THE COURT:  <u>Is that a man or a woman</u>?

THE SHERIFF'S OFFICER: <u>That would be a woman.  She was involved in the first thing that happened.  This was with a different juror</u>.

<u>So when she said she slapped her she went back in to try to get back in her face, calling her a liar, and that's when Officer Karlick took the lady in the pink and I took her outside, and we separated her</u>.

THE COURT: I'm going to ask Juror Number 8 -- I'll bring her in and ask her what happened.

But before I get to that, supposing [Juror 16] says he can't deliberate tomorrow?  Then what?

[DEFENSE COUNSEL]: Your Honor, if [Juror 16] says he can't deliberate tomorrow, given what has transpired in the course of this day, I would submit that I don't think the Court could submit -- or substitute a juror in.

THE COURT: I might have to tell [Juror 16] he has to move his trip.

[DEFENSE COUNSEL]: The problem that -- I think that has arisen now, I think the Court would have to inquire of Juror Number 8. I think that they have created, within the jury room, a very hostile and volatile situation because I would just submit whatever incident occurred before -- Juror Number 1 and Juror Number 8 were the two smokers and they just had to leave.

When I was in chambers with yourself you said you were going to come out. I didn't make it from the door over here and you heard the loud banging on the doors and the officers ran to the back.

When the door was opened you could see the people like, here, at the door. I don't know what took place, but clearly there is a volatile situation, and the banging on the door wasn't like a knock, it was a significant amount of banging like, "We need somebody in here right away."

I'm concerned right now with the composition of -- the jury is already, I think, may be compromised and they may not be able to focus because I think there is a volatile situation that is occurring in that jury room.

THE COURT: We don't know what is going on in there because I have not asked anybody yet. I've been reluctant, to the extent that I didn't want to interfere with the deliberative process.

You were asking me to do what?

[DEFENSE COUNSEL]: I understand that, but --

THE COURT: What are you asking me to do.

[DEFENSE COUNSEL]: This is a totally -- a situation -- I'm kind of, at a loss for words. I think the Court has to, first, inquire to [Juror 16] can he deliberate tomorrow, and also inquire as to Juror Number 8.

I guess what took place -- you have an officer that made representation on the record that someone slapped her. I know there is, at least, two women in there that has on a pink shirt. Juror Number 7 has a pink shirt and a jacket.

THE COURT: Suppose -- [Prosecutor], what do you propose I do?

[PROSECUTOR]: I think first thing is to find out about [Juror 16's] situation for tomorrow.

The second thing, if he is able to come back tomorrow then I think the best course of action is to break now, let them go home, let them calm down, bring them back tomorrow.

THE COURT: Suppose [Juror 16] says, "I have my trip. I'm leaving on a plane at 8 o'clock tomorrow morning."

[PROSECUTOR]: Then I think we make a pointed inquiry as to why it is all of a sudden today when he never mentioned it during voir dire. I could recall, and Counsel could recall, and your Honor could recall that he never mentioned the trip; and then he was well aware of the fact that when the case

27

was going to end even earlier this week or
what was going on earlier this week and it's
only today there is some mention of it.

I think given the gravity of the case, I
think there would be grounds to say to him
-- because you didn't advise -- I think the
interest of justice sometimes have to
prevail and he should be instructed that he
needs to make every effort to reschedule
that trip.

THE COURT: Suppose I do that. Either he
says, "I'm available to deliberate," or I
order him -- well, under these circumstances
you are just going to have to forego that
trip. All right? What do you propose I do
with the other jurors?

[PROSECUTOR]: I think you have to be very
careful about inquiring as to what was going
on in that jury room. We can't intrude on
the deliberative process.

[(Emphasis added).]

The prosecutor suggested the judge bring the deliberating

jurors back to the courtroom and instruct again on the need to

be respectful to one another. The prosecutor cautioned the

judge against asking individual jurors to describe in detail

what transpired between the jurors involved in the physical

altercation. According to the prosecutor, such an approach is

"liable to get answers about what is going on in the

deliberations, and I think that is clearly inappropriate."

Alternatively, the prosecutor suggested the judge order the

jurors to deliberate in a respectful manner under penalty of being held in contempt. In the prosecutor's own words:

> [I]f your Honor was to order them and say to them, "You are instructed . . . if you violate the order you are going to be subject to a contempt charge, if you violate my order, and you want to get -- have physical altercations or inappropriate verbal shouting in that jury room" -- then I think they will understand that that this is inappropriate behavior, it's not something that is to go on in that jury room, and avoids the possibility that they are going to somehow divulge what is going on in terms of the deliberations.
>
> .   .   .   .
>
> And I think at that point they understand, listen, they need to knock it off and they need to act in a civilized manner and reach a verdict or not reach a verdict, whatever may happen, but do it within a manner that is completely within the bounds of what is expected of a juror in the County -- in this State.
>
> THE COURT: [At this point the judge addressed defense counsel by name and implicitly asked for her response to the prosecutor's suggestion.]
>
> [DEFENSE COUNSEL]: I would agree with [the prosecutor], except for the fact that at 3 o'clock there was a situation that occurred and a little over an hour later after you had them out here directing them to deliberate in a respectful manner to each other, and so forth, that an hour later you have a volatile situation with the same juror from before, also with a juror making representations to the officers, not about where they stand in their deliberation process, that somebody inflicted physical

29                                                          A-0879-10T2

harm on her. I think that is something very serious and the Court could inquire as to what took place or what happened without divulging where they are in the deliberation process.

My concern is that it's a volatile situation in there, whereas people are not allowed to openly speak their mind or freely express their views in there, especially if you have a juror saying that somebody else struck them in there.

THE COURT: Well, let's start with [Juror 16] and see where we go from there.

[(Emphasis added).]

The record reflects that Juror 16 "was brought out into the courtroom." At this point, we note the judge did not instruct the remaining jurors to cease deliberating until Juror 16 rejoined them.

THE COURT: [Addressing Juror 16 by name], I got a note from the jury that -- I assume you are aware of it -- says, "We would like to stop today at 4:30 and we would like to resume when you deem appropriate."

Are you able to deliberate tomorrow?

JUROR 16: No. No, sir.

THE COURT: You have to speak up louder.

JUROR 16: No, sir.

THE COURT: When are you leaving?

JUROR 16: Tomorrow morning at 6 a.m.

THE COURT: Why is it that this morning was the first time I heard about this?

A-0879-10T2

JUROR 16: Because when we first started the case was supposed to stop two weeks ago. I said no sense [sic] because I thought the case was going to finish two weeks ago.

THE COURT: Why didn't you tell me last week or why didn't you tell me before the jury started deliberating?

JUROR 16: Well, I thought, as I said, I thought the case was going to be finished before tomorrow.

THE COURT: What if I told you you have to come back here tomorrow and continue to deliberate?

JUROR 16: I guess I would have no choice.[18]

THE COURT: All right. Go back in the jury room for a minute.

---

[18] We have described in some detail the conflict with Juror 16 to illustrate our awareness and appreciation of the fluidity of events and the multiplicity of issues that often arise in jury trials. We appreciate the pressure associated with managing these events as they arise in real time. However, it is absolutely imperative for trial judges to appreciate how their most "subtle behavior" can have a great and unintended coercive effect on a juror. State v. Figueroa, 190 N.J. 219, 228 (2007). Here, Juror 16's reluctant acceptance of the court's authority to disrupt his vacation plans may have had the unintended consequence of making him angry against a perceived inflexible and insensitive judicial system. In our view, more information should have been gathered before determining that Juror 16 could continue to deliberate. For example, we do not know: How long had Juror 16 planned this trip? Did this trip have any special significance to Juror 16? Was this associated with a wedding anniversary or some other special event? Were there any economic consequences to Juror 16 for postponing or cancelling the trip? This and other similar information would have given the trial judge a better means of ascertaining whether forcing the juror to continue deliberating may affect the juror's ability to perform his duties consistent with his oath.

At this point the record reads: "Juror excused from the courtroom." We again note the absence of any instruction from the judge directing Juror 16 not to discuss this matter with his fellow jurors. With respect to the jury, given the lack of any instructions from the court on what they should have been doing while Juror 16 was being questioned, we also do not know if deliberations were affected by Juror 16's absence from the jury room.

With these observations in mind, we now return to Juror 16's vacation conflict.

> THE COURT: All right. Let's talk about [Juror 16] for a moment.
>
> Seems to me that if I tell him he has to come back tomorrow he's going to come back here and do his duty.
>
> Anybody disagree with that? You want to be heard?
>
> [DEFENSE COUNSEL]: He said he would come back. The only thing I would ask of the Court is the same way you inquired this morning would he be able to focus, would the fact you are making him change his trip, or anything like, that impact on his ability to properly deliberate in the back in the jury room. I think the Court would have to make that inquiry.
>
> THE COURT: All right. I'll do that. Now, as far as the rest of the jury is concerned, I would like each of your input on what I'm proposing to do.

You are correct [addressing defense counsel], that I told this jury that. I told them that I was directing them to go and deliberate and thoroughly discuss whatever it is they thought they needed to discuss, and that I wanted them to treat each other with respect and courtesy. But I didn't say -- I could have said it a lot more forcefully. And suppose I bring them all in the box and tell them that I am ordering them under no uncertain terms, Court order, ordering them to come back tomorrow and deliberate, and they needed to treat each other with courtesy and respect and no yelling, no screaming, no resorting to any threats, either implicit or explicit, and no way were they to, in any way, get physical or insinuate, in any way, they were going to get physical with each other, and then ask them each individually would they be able to follow that direction without any reservation. If they each said yes to that, tell them to go home, relax, come back at 9 o'clock and give it one more shot tomorrow morning.

Is that acceptable to you?

[DEFENSE COUNSEL]: Two things. If the Court is going to do that -- I would ask if you do that take each juror individually and have them answer those questions and then afterwards, after you have a consensus that everybody could do that, ask if you re-instruct them again on the <u>Allen</u> charge, whereas they continue to deliberate -- and all that other stuff — to give them the modified <u>Allen</u> charge that you read before, recharge them on that.

The prosecutor concurred with defense counsel's suggestions for the most part, but deferred to the court's discretion on whether to address the jury as a group, or speak to each juror

individually. Although not showing a distinct preference, the judge ultimately acceded to defense counsel's request and addressed each juror individually. The following instructions the judge gave Juror 1 illustrate, for the most part, the instructions the judge gave to all of the deliberating jurors.

> THE COURT: [Addressing Juror 1] Basically, I called you first because you are Juror Number 1, but I plan to call out each juror individually and tell them the following, and then ask the follow-up questions. So what I'm telling you what I'm going to ask you at the end of it I'll do it with every juror afterwards.
>
> <u>I'm going to order you and each and every juror in the back who is deliberating -- this is a Court order -- it's not a suggestion, it's not a directive, it's a Court order</u>, and I'm going to order you to come back tomorrow at 9 o'clock. I want you to fully deliberate on any issues that you think are appropriate that you think need to be discussed to come to a resolution of this case, but I'm also ordering each and every one of you that you are to treat each other with courtesy and respect. That means no yelling at each other, no screaming at each other, no threats -- no implicit or explicit threats or anything physical is going to go on either implicitly or explicitly, would you be able to follow that direction and continue to fully deliberate in this case?
>
> JUROR 1: Yes.
>
> THE COURT: I'm going to ask you, number one, to go back into the jury room for a couple more minutes and I'm going to ask you to ask [the next juror] to come out.

A-0879-10T2

THE COURT: [Addressing the attorneys] Is that satisfactory, the way I did that?

[PROSECUTOR]: Yes, Judge.

[DEFENSE COUNSEL]: Yes.

[(Emphasis added).]

The judge repeated the instructions he gave to Juror 1 to the next juror who reported to the courtroom. When the judge asked this juror whether he would be able "to follow those directions and continue fully deliberating the matter[,]" this juror responded: "Your Honor, if I could?  <u>I believe that it would be extremely difficult for the jury to do that</u>." (Emphasis added).  This prompted the following colloquy:

THE COURT:  I'm asking you -- I'm asking -- I'm not asking that question.

THE JUROR: Yes, I could.

THE COURT:  I'm asking, would you be able to follow those directions and continue to fully deliberate and discuss the case?

THE JUROR:  Yes.

THE COURT:  All right.  I'll ask you to go back into the jury room and ask [identifying the next juror by her last name] to come out.

The next two jurors listened to the judge repeat his "order" setting forth the civility code he expected each juror to follow during the deliberations, and answered "yes" to the ultimate question about their ability to follow the "order."

35

The most significant deviation from what the judge expected occurred after he finished instructing Juror 8. We will recite the actual instructions the judge gave to Juror 8 because these instructions did not contain the same compulsory language the judge emphasized when he addressed the previous jurors.

> THE COURT: [Addressing Juror 8] Have a seat somewhere at the end wherever you are comfortable, just at the end of the jury box.
>
> I'm calling each juror out individually and basically saying the same thing to them, asking them the same question. So you are -- you are Number 8, and then I'll call [N]umber 9, and so forth.
>
> Basically what I am ordering each of you jurors, deliberating jurors, to do is ordering you to come back tomorrow at 9 o'clock, to continue to fully deliberate on the case, all go back and discuss whatever you believe is necessary to talk about. I'm further ordering each of you in your deliberations to treat each other, in this process, with courtesy and respect, not to scream, or yell, or raise voices. Not to in any way, either implicitly or explicitly, threaten anyone.
>
> Would you be able to follow those directions?
>
> JUROR 8: Honestly? No, not after I just got hit in there. I can't do it.
>
> THE COURT: Counsel, let me see you at sidebar.
>
> [(Sidebar discussion)]

36                                                    A-0879-10T2

[DEFENSE COUNSEL]: Your Honor, . . . I'm not going to declare the jury a deadlock, but what I said -- this lady [referring to Juror 8] is the same lady involved with both incidents and she said she was hit which, to me, would mean she is not able to openly speak her mind in that jury room and somebody, I don't know, who has resulted in violence against this juror, and she openly said she could not continue. And then now say, for example, you wanted to remove her and get rid of her and substitute another juror and have this other juror come in -- I think given what took place you couldn't do that.

Second, in addition, you technically would only -- for example, if the Court remotely wanted to do that you have -- when they come back tomorrow and don't reach a decision then you have a problem again because you will lose one of the other alternates because he's leaving to go away on Sunday. And you also have to make the inquiry of Juror Number 16 as to is he able to focus even after you order him to come back.

THE COURT: Push him to the side.

[DEFENSE COUNSEL]: You have a whole lot of issues, and I would think that at this time, given what she has said and what we have seen in the courtroom and have heard in the courtroom, that this juror and, even Number 2 . . . Juror Number 3 started to allude to the fact he thought they would not be able to reach -- and the Court stopped him before he was able to finish. I think you have a whole lot of issues going on with the jury.

THE COURT: I'm not concerned about [Juror 3. He] says he has no problem continuing to deliberate and following my orders. I'm not worried about [Juror 3].

37

[Juror 16], I'm going to ask him those follow-up questions you want, but for purposes of this discussion I'm assuming that [Juror 16] will need to do what he needs to do and follow the rules.

What about this lady?

[DEFENSE COUNSEL]: This is a problem.

THE COURT:  I heard her say --

[PROSECUTOR]: I think -- I understand this has been an emotional day for them.

I think if you ordered her to go home, return tomorrow morning, that -- and given a chance to cool down, I think, before they begin deliberations tomorrow morning that you instruct her that you are going to ask these questions again tomorrow, but <u>she is to go home and resume deliberations in a proper manner, as she was sworn to do</u>.  That while there may be things that upset her in that room that they need to be put to the side so she could perform her duties fairly, without emotion, without any interference, and then you give her a chance to cool down and come back tomorrow morning and  --

THE COURT: If I go through the rest of these jurors what happens if one or two more -- their reaction is her reaction?

[PROSECUTOR]: We have to see what happens. But I think the same thing would apply.

I think if you give them overnight and then re-instruct them in the morning and then --

THE COURT:  I'm willing to go through the remaining other jurors and see what kind of answers I get and then we will speak again.

[DEFENSE COUNSEL]: I know the Court will wait to see what happens, but I think the

A-0879-10T2

> Court has to inquire -- she already said she couldn't come back, and if you -- if what you are saying is true, if you order them to come back and deliberate, all but for the fact that she was the one that was hit, <u>she wasn't the aggressor</u>, <u>there is a problem</u>. I think it's like really volatile in there.
>
> THE COURT: Well, let me see what the rest of them say.

[(Emphasis added).]

This lengthy sidebar discussion occurred while Juror 8 sat in the jury box. At this point, without further explanation to Juror 8, the judge asked her to "have a seat outside for a moment[;]" the judge then asked that Juror 9 be brought into the courtroom. Once Juror 9 was in the courtroom, the judge ordered him to deliberate in a respectful manner, using an abridged version of the "civility order" similar to the one he gave to Juror 8. Juror 9 indicated he was able to deliberate under those conditions and he returned to the jury room without further incident. The same process was repeated with the remaining jurors, producing the same result.

With respect to Juror 16, in addition to instructing him on his duties to deliberate and interact with his fellow jurors in a respectful manner, the judge asked him if he "would be able to fully concentrate, give all your attention that is necessary to the case?" Juror 16 responded: "Yes, I would be." We presume the judge asked Juror 16 this question in response to defense

39

counsel's earlier request that the court inquire about his ability "to focus even after you order him to come back."

At the end of this process, the trial judge decided to bring Juror 8 back into the courtroom.

> THE COURT: [Addressing Juror 8 by name] I brought, like I brought you out of court, each and every juror who is sitting in the back deliberating, I brought each of them out here and I told them that they were each under a court order, not a suggestion, not a directive, a court order, with all that that implies, ordered to come back here tomorrow at 9 o'clock to continue to fully deliberate and discuss anything that anybody on the jury thought was appropriate or relevant to discuss in the case.
>
> I further ordered each and every juror that they were under court order to treat everyone else in that room with courtesy and respect, and I further ordered them that -- that that meant specifically no yelling, no screaming, no raising of voices, no threats, whether they were implicit or explicit, whether it was verbal or physical, and that nobody was to have any physical contact with anyone else. I ordered each and every one of them that.
>
> With that being said, would you be able to continue deliberations in this case?
>
> JUROR 8: If you're ordering me back, yes, I will do it, but --
>
> THE COURT: Well, but --
>
> JUROR 8: I can do it fairly. That's not -- that's not my problem.
>
> THE COURT: No, no, no, that's not what I'm -- but -- what I'm asking you is would you

be able to continue your deliberations and fully discuss anything that you think is appropriate to discuss, would you be able to take and stand by any position that you think that you need to stand by? Yes?

JUROR 8: Yes.

THE COURT: All right. Counsel, what I plan to do is to bring all of the jurors out to give them those instructions that you suggested that I give on -- out of the jury charge that I gave earlier and then send them home and tell them to come back at 9 o'clock tomorrow and continue with their deliberations as soon as the 12 of them are here, that they can start to deliberate.

Does anybody want to be heard further on anything?

[PROSECUTOR]: No, Your Honor. Thank You.

[DEFENSE ATTORNEY]: No, Judge.

The jury then returned to the courtroom. After some preliminary remarks about scheduling matters unrelated to the case, the trial judge again instructed the jurors assembled by repeating the model charge on deliberations. The judge also reminded the jurors that when they returned the next day to resume deliberations, each one of them were

under court order, not a suggestion, not a directive, a court order and all that it entails, and each of you told me individually that you will have no problem following this order and you will follow this order, and the order is once again that you will fully deliberate the issues in the case, that you will fully discuss whatever you or any other juror think is important to

41

discuss in trying to reach a consensus and fulfilling your oath and your duties as jurors, that you are -- each have agreed and you understand you're under court order to treat each other with courtesy and respect, and more particularly, <u>that means that there's to be no yelling, no screaming, no raising of voices, no threats whatsoever, either implicitly or explicitly, and no reference, nobody is to touch anybody, nobody is to get physically near anyone</u>.

And I am telling you all that <u>if there is a violation of that court order I am going to take appropriate action</u>. You all took an oath to, and I expect you each to fulfill that oath, and that oath is to be fair and impartial and fully discuss the issues in this case and to decide the case on the evidence, on the merits.

[(Emphasis added).]

The following day was the third day of deliberations. The record of this day began with the trial judge apprising the attorneys that "<u>somebody passed me a note and said somebody wanted to put something on the record</u>." (Emphasis added). This prompted defense counsel to acknowledge that she had written the note. After waiving defendant's right to be present in the courtroom "for purposes of this request," defense counsel moved for the court to declare a mistrial. Counsel argued that "in light of what took place yesterday . . . one of the jurors being assaulted by another juror during deliberation, I feel . . . this juror's will may be overborne." Defense counsel further argued the court's measures were insufficient to overcome the

A-0879-10T2

"hostile environment" created in the jury room by this altercation.

In response, the trial judge noted for the record that he had followed "the procedure" defense counsel herself had recommended "to a T." The judge emphasized that he had specifically questioned

> the juror in question, [to determine] . . . whether she was able to continue to deliberate fully and completely about all of the issues in the case that she felt were important to her and, furthermore, . . . asked her, more specifically saying, that what I mean by that is that will you be able to fully and completely express all your opinions, and positions, and stand by any position that you think is appropriate? And she unequivocally, said yes.

The prosecutor agreed with the judge's characterization of Juror 8's disposition and willingness to continue deliberating. We note, however, that in his remarks endorsing the measures employed by the court, the prosecutor noted the court had not taken any action to discover the identity of the juror who "actually, did the striking." At the conclusion of the prosecutor's comments, the judge noted "it's now 10:20 [a.m.] and they've been deliberating since 9 o'clock with -- apparently, without any problems." The court denied defendant's motion for a mistrial, finding "[e]ach and every juror indicated they could fully, completely, freely, and thoroughly deliberate,

43

and I have no reason to believe that that is not what they are doing."

The record shows the jury deliberated for the rest of the day, during which the jury sent out additional notes seeking instructions on substantive legal questions and other matters that are not before us.[19]   The jury reached a verdict at 3:50 p.m. on July 10, 2009, after two and one-half days of deliberations.

III

Against this record, defendant now appeals raising the following arguments.

POINT I

A MISTRIAL SHOULD HAVE BEEN DECLARED WHEN TWO JURORS ENGAGED IN A PHYSICAL ALTERCATION DURING DELIBERATIONS.

---

[19] Our review of the record revealed that defense counsel objected to the trial court's unilateral decision to have certain ex parte communications with the jury.  Specifically, without counsel's knowledge or consent, the judge permitted two deliberating jurors to ask him permission to take a break "to get some air, and buy some coffee."  This resulted in the court allowing the jury to take a twenty-minute break without informing the attorneys.  Although our decision to set aside defendant's conviction is not based on this issue, because we are remanding this case for new trial, we take this opportunity to remind the trial court of our Supreme Court's unequivocal condemnation of any kind of ex parte communication between the judge and the jury.  As the Chief Justice recently reaffirmed on behalf of a unanimous Court: "Judges should not engage in ex parte communications with jurors, even on innocuous scheduling matters."  State v. Morgan, 217 N.J. 1, 17 (2013).

44

POINT II

WALKER'S OUT-OF-COURT IDENTIFCATION OF THE CO-DEFENDANT, WHICH HAD BEEN SUPPRESSED AS IMPERMISSIBLY SUGGESTIVE AND UNRELIABLE, SHOULD HAVE ALSO BEEN EXCLUDED AT THIS DEFENDANT'S TRIAL. (Not Raised Below)

POINT III

THE COURT FAILED TO CHARGE ALL THE APPROPRIATE LESSER-INCLUDED OFFENSES OF ATTEMPTED MURDER THAT AROSE FROM THE FACTS. (Not Raised Below)

POINT IV

THE DEFENDANT WAS CONVICTED OF CONSPIRACY TO COMMIT MURDER ON AN ACCOMPLICE LIABILITY THEORY THAT WAS NOT PRESENTED TO THE JURY. (Not Raised Below)

POINT V

THE SENTENCE OF 45 YEARS WAS MANIFESTLY EXCESSIVE AS IT REPRESENTED THE MAXIMUM LEGAL TERM PERMISSIBLE ON EACH OF FOUR COUNTS, ALL OF WHICH RAN CONSECUTIVE TO EACH OTHER.

The dispositive issue raised by defendant concerns the reliability of the jury's verdict. Defendant argues the trial court should have granted defense counsel's motion for a mistrial after the altercation in the jury room. Defendant claims the judge did not properly investigate the nature of this violent incident between jurors, forcing two or more combative jurors to continue deliberations in order to obtain a verdict. The State claims the judge properly exercised his discretion in

45                                                              A-0879-10T2

responding to the problems that arose among certain jurors and appropriately determined that "each juror could continue to fully and completely deliberate." According to the State, the "nuanced" verdict returned by the jury is indicative of the jurors' ability to deliberate effectively.

We agree with defendant's arguments and reverse. On the second day of jury deliberations, the Sheriff's Officers charged with the jury's security and safety responded to loud banging on the jury room's door. Once inside, the Officers were forced to intervene and physically separate three jurors, one of whom reported being threatened, accosted, and assaulted by a fellow juror. This intervention by the Sheriff's Officers occurred immediately after or contemporaneous with the jury's report that it was "hopelessly deadlocked." Under these circumstances, no reasonable juror could have been expected to remain unaffected by the violence and chaos that permeated the deliberative process.

We also conclude the judge's efforts to ascertain what occurred in the jury room were inadequate and did not provide the court with the information necessary to determine whether there was a way of salvaging this legally moribund trial. Finally, the supplemental instructions issued by the judge to restore order and civility were ineffective and served only to

exacerbate the coercive atmosphere created by the violence that preceded it. Because these issues are sufficient, in and of themselves, to overturn defendant's conviction, we need not, and specifically do not, reach the remaining arguments raised by defendant in this appeal.

We begin our analysis by highlighting that the right to a jury trial in criminal matters is one of the founding principles of our Republic and is guaranteed by both the Sixth Amendment of the Constitution of the United States, United States v. Gagnon, 470 U.S. 522, 526, 105 S. Ct. 1482, 1484, 84 L. Ed. 2d 486, 490 (1985), and Article I, Paragraph 10 of the New Jersey Constitution, State v. A.R., 213 N.J. 542, 557 (2013). As the guardian of that guarantee, the trial judge is entrusted with the responsibility of controlling courtroom proceedings and is bounded by the law and the rules of the court. State v. Tedesco, 214 N.J. 177, 188-89 (2013).

A jury verdict must be guided by correct legal instructions from the trial judge and unaffected by matters extraneous to the evidence presented at trial. Thus, "[e]rroneous instructions on matters material to the juror's deliberations are presumed to be reversible error." State v. Allen, 308 N.J. Super. 421, 431 (App. Div. 1998) (quoting State v. Grunow, 102 N.J. 133, 148 (1986)). Although granting a mistrial in a criminal case "is an

extraordinary remedy[,]" the trial judge is bound to grant this relief when it is necessary "'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)).

The role of the jury as the judges of facts is predicated on the integrity of the deliberative process. State v. Corsaro, 107 N.J. 339, 346 (1987). In those cases where the jury announces an inability to reach a unanimous verdict, the decision whether to grant a mistrial turns on whether the duration of the deliberations balanced against the length of the trial and the complexity of the proofs shows the jury has made a good-faith effort to reach a sustainable verdict. See State v. Ramseur, 106 N.J. 123, 300-05, (1987), cert. denied, 508 U.S. 947, 113 S. Ct. 2433, 124 L. Ed. 2d 653 (1993). Beyond this, any further direction from the judge to continue deliberations, especially in the absence of a reminder of the right to return a non-unanimous verdict, could be viewed as coercive. See Figueroa, supra, 190 N.J. at 236 (citing State v. Hunt, 115 N.J. 330, 382-85 (1989)).

In determining the propriety of a trial court's response to a jury's inability to reach a unanimous verdict, our Supreme Court has identified two principal concerns: (1) whether the supplemental instruction has the capacity to improperly

influence the dissenting jurors to change their votes; and (2) whether "the weighty role that the judge plays in the dynamics of the courtroom" improperly coerced the jury into returning a verdict. Id. at 237-38.

Thus, when instructing a jury that reports being deadlocked, a trial judge must be especially vigilant to avoid communicating a results-oriented message that could be perceived as intolerant of dissent and antagonistic to the free expression of strongly held beliefs that may not be shared by a majority of the deliberating jurors. As the Court emphasized in Fiqueroa, "'juries may accord great weight and deference to even the most subtle behaviors of the trial judge.'" Id. at 238 (internal citation omitted).

In State v. Czachor, 82 N.J. 392, 405 n.4 (1980), our Supreme Court approved the modern version of supplemental instructions trial judges now use in response to a jury's announcement of being deadlocked.

> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the

> weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.
>
> You are not partisans. You are judges -- judges of the facts.
>
> [Ibid. (internal citation omitted) (emphasis added).]

These instructions envision a deliberative process guided by reason and integrity. The admonition to guard against reaching an agreement that may do "violence to individual judgment" is a metaphor for what we now refer to as "bullying." The instruction warns against majoritarian bullying and permitting expediency of results to justify intellectual and moral dishonesty. The corrosive effect "violence to individual judgment" may have on the deliberative process pales in comparison to the chilling effect actual physical violence can have on the ability to freely and honestly express controversial or unpopular views.

A physical altercation between two or more deliberating jurors constitutes an irreparable breakdown in the civility and decorum expected to dominate the deliberative process. Physical violence among jurors is the antithesis of the rational discourse embodied in the Court's admonition in Czachor. A jury verdict tainted by such an inherently coercive and chaotic

A-0879-10T2

environment is an affront to any notion of civilized justice and cannot stand as a matter of law.

It is particularly important to emphasize that the violence that erupted in the jury room here occurred immediately after, if not contemporaneous with, the announcement by the jury that it was "hopelessly deadlocked . . . finding it impossible to make further progress to make a unanimous decision on any Count." It is thus reasonable to conclude that the violent episode may have had some causal relationship to the impasse. Although we do not know what caused these belligerent acts, we know that what occurred was not merely a passionate exchange of conflicting views. Jurors 7 and 8, and possibly a third unidentified juror, were involved in an act of violence so serious and disruptive, that it prompted the remaining jurors to seek immediate assistance by summoning the Sheriff's Officers responsible for their safety.

As described by defense counsel, an unknown number of jurors began "banging on the door . . . [not] like a knock, it was a significant amount of banging like, 'We need somebody here right away.'" The Sheriff's Officer who responded also indicated hearing loud banging on the jury room's door. One of the Officers who entered the jury room described seeing "a heated argument between two jurors." Although he "asked them to

please just sit down, . . . [t]he argument <u>escalated</u>." (Emphasis added). Unfortunately, the trial judge did not ask the Officer to elaborate or explain what he meant by "the argument escalated." Despite the absence of these crucial details, we are nevertheless troubled by the fact that the intervention of law enforcement officers not only failed to stop or reduce the intensity of the argument, but the quarrel actually "escalated" after their response.

The Sheriff's Officers who responded to the jury room were also uncertain about the number of jurors involved in the melee. One Officer described witnessing an argument "between three parties." After the Officers were able to physically separate the belligerents, one Officer reported to the judge that Juror 8 said "somebody tried to take her in the bathroom and wanted to fight with her in the bathroom." Juror 8 also told the Officer that: "The juror with the pink shirt slapped her." When the judge asked the Officer to identify the gender of the juror who had allegedly "slapped" Juror 8, the Officer responded:

> That would be a woman. She was involved in the first thing that happened. This was with a different juror.
>
> So when [Juror 8] said she slapped her [Juror 8] went back in to try to get back in her face, calling her a liar, and that's when Officer Karlick took the lady in the pink [(the alleged assailant)] and I took [Juror 8] outside, and we separated her.

From this record, it is clear the trial judge had sufficient grounds at the time to find probable cause that one juror had threatened to commit physical harm against a fellow juror, and another juror may have actually physically assaulted a fellow juror, all in the course of deliberations. Although the decision of the Sheriff's Officers to separate the jurors involved avoided the potential for further escalation of the violence, we can reasonably assume the chaotic tension created by this event lingered on in the jury room like menacing storm clouds. Under these circumstances, it defies common sense to expect a reasonable juror to be able "to deliberate with a view to reaching an agreement <u>without violence to individual judgment</u>."

<u>Supplemental Instructions</u>

The trial judge's attempts to restore order and respect to the deliberative process through supplemental instructions were in our view wholly and facially ineffective given the level of violent discord that had occurred up to that point. However, our concern here with respect to these instructions runs far deeper. We are satisfied that the judge's instructions actually exacerbated the problem. These instructions were nothing short of a sweeping, judicially imposed "civility code of conduct."

53                                                    A-0879-10T2

Regarding the civility restraining order, the court emphasized: "it's not a suggestion, it's not a directive, it's a Court order" enjoining the jurors "to fully deliberate on any issues that you think are appropriate that you think need to be discussed to come to a resolution of this case." However, the jurors engaged in these court-ordered "discussions" were also "ordered" to "treat each other with courtesy and respect." The judge then elaborated on the kind of conduct he expected the jurors to follow: "no yelling at each other, no screaming at each other, no threats -- <u>no implicit or explicit threats</u> or <u>anything physical is going to go on either implicitly or explicitly</u>." (Emphasis added). The court concluded with the following admonition:

> And I am telling you all that <u>if there is a</u>
> <u>violation of that court order I am going to</u>
> <u>take appropriate action</u>. You all took an
> oath to, and I expect you each to fulfill
> that oath, and that oath is to be fair and
> impartial and fully discuss the issues in
> this case and to decide the case on the
> evidence, on the merits.

> [(Emphasis added).]

Not surprisingly, when the trial judge asked Juror 8 if she would be able to abide by this court-ordered civility code, she responded: "<u>Honestly? No, not after I just got hit in there. I can't do it.</u>" This prompted the court to direct Juror 8 to sit outside, while he engaged in a lengthy discussion with the

54

attorneys about what should be done with Juror 8. Defense counsel reminded the court that Juror 8 was the alleged victim of the assault, not the aggressor. The prosecutor, however, was unmoved by this distinction, and insisted the court make clear to Juror 8 her obligation under the civility code to deliberate.

After instructing the remaining jurors with the court-ordered civility code, and addressing the vacation conflict with Juror 16, the judge brought Juror 8 back before him and repeated the court-ordered civility code. At the conclusion of which, he once again asked her if she was willing to abide by it. When she responded: "I can do it fairly. That's not -- that's not my problem," the judge seemed baffled and frustrated by her response:

> THE COURT: No, no, no, that's not what I'm -- but -- what I'm asking you is would you be able to continue your deliberations and fully discuss anything that you think is appropriate to discuss, would you be able to take and stand by any position that you think that you need to stand by? Yes?
>
> JUROR 8: Yes.

This colloquy between Juror 8 and the trial judge captured the essence of the futility of any attempt to impose civility and respect in the deliberative process by the threat of judicial sanctions. As a starting point, the court's prohibitions of "implicit or explicit threats or anything

physical . . . either implicitly or explicitly," are so facially ambiguous, any attempt at enforcement is rendered virtually impossible. What one juror may perceive as an implicit threat to intimidate, may be viewed by another juror as nothing more than a passionate, yet ultimately innocuous expression of opinion about the evidence in the case.

Second, this approach ironically places the judge in the middle of an intentionally cloistered environment. Any alleged violation of this court-ordered civility code would require the judge to adjudicate the dispute and impose the appropriate sanction if warranted. This would presumably require the judge to conduct some kind of hearing to determine the veracity of the accuser. Rudimentary notions of due process would entitle the accused juror to call other jurors as witnesses in his or her own defense. In short, this is a completely impractical, utterly unworkable approach that impermissibly transforms the judge into an interloper at the center of jury deliberations. This approach is in direct violation of one of the Supreme Court's principal concerns in Figueroa, avoiding "the weighty role that the judge plays in the dynamics of the courtroom" to improperly coerce the jury into returning a verdict. Figueroa, supra, 190 N.J. at 237-38.

As a final matter, we are compelled to comment on the limited investigation conducted by the trial judge. This case involved extremely serious charges against defendant. The State alleged defendant, a member of a notoriously violent street gang, murdered a nineteen-year-old woman by shooting her nearly at pointblank range, in the living room of her own apartment. He and his co-defendant thereafter allegedly threw this young woman out of the fourth-story window of her apartment. Other occupants in the apartment also allegedly escaped being shot by jumping out the same fourth-story window. According to the State, defendant committed these extreme acts of violence as gang-related acts of retaliation.

Against this backdrop, when the trial judge became aware of a violent altercation between two, possibly three jurors, on the first full day of jury deliberations, the judge should have officially reported the incident to a senior ranking Officer of the Sheriff's Department, the law enforcement agency entrusted for the safety and security of the deliberating jurors.[20] The record before us is grossly inadequate to make any kind of informed determination about the root cause of this altercation.

---

[20] This law enforcement investigation would follow a judicial determination that a mistrial is warranted. Absent such a finding, the judge has complete and exclusive authority over the management of the trial.

When violence intrudes into the deliberative process in any form and to any degree, a trial judge must take immediate action to investigate what occurred, not only to determine whether a defendant's right to a fair and impartial trial has been compromised, but also to ensure the safety and security of all involved. Our courthouses are the citadels of justice. A courtroom is a forum governed by reason and invulnerable to intimidation because of it. Jury duty is both a right and obligation of citizenship. Jurors who report to our courthouses in response to this obligation and to exercise this right are entitled to feel safe and secure.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0879-10T2