303 Ga. 507
FINAL COPY

S18A0314.  MEADOWS v. THE STATE.

NAHMIAS, Justice.

Appellant Jedarrius Treonta Meadows challenges the trial court's denial of his plea in bar based on double jeopardy after the court — sua sponte and over Appellant's objection — declared a mistrial of his murder trial during jury deliberations.  In its order denying the plea, the court said that the deliberations were contentious and that it declared the mistrial "in the interest of juror safety." Having reviewed the record, we conclude that the trial court declared the mistrial without sufficient factual support and without considering less drastic alternatives to terminating the trial.  Because there was no manifest necessity for a mistrial, we reverse the denial of the plea in bar.

1.     The record shows that on February 22, 2014, Damion Clayton was shot and killed in a baseball park in Macon.  On March 4, 2014, a Bibb County grand jury indicted Appellant, Roland Watson, and Trayvon Starks for malice murder and felony murder; on June 10, 2014, they were reindicted on those two

murder charges along with aggravated assault, armed robbery, and two counts of gang activity. Appellant's trial was severed, and his co-indictees agreed to testify for the State.

The trial began on Tuesday, September 8, 2015, the day after Labor Day. The parties rested their cases on Friday, and with the concurrence of the jury, the court decided to continue the trial on Saturday. After counsel gave their closing arguments on Saturday morning, the judge instructed the jury, which then began its deliberations around 1:30 p.m. Shortly after the jurors began deliberating, they chose to continue through their lunch break and were brought lunch. After lunch, the court received a note from one of the jurors. The note said that the juror wanted "to be replaced with one of the alternates because [she was] not in her right mind." The juror was brought to the courtroom, and when the judge asked if she was capable of deliberating and returning a verdict, she replied that she was not, saying, "I don't have time to go back and forth about my opinion — I just — I don't want to do it." The judge asked the State and defense if they had any questions for the juror; they did not. Without objection, the court excused the juror and replaced her with an alternate.

The jury was instructed to resume its deliberations with the alternate juror.

Shortly thereafter, the jury asked to view a recording in the evidence, which was provided.[1] Later that afternoon, the deputy sheriff who was serving as the court's bailiff apparently came to the judge's office twice to express his concern about the contentious deliberations in the jury room.[2]

Around 4:20 p.m., the judge brought the jury into the courtroom, asked if there had been a vote, and instructed the jury not to divulge the direction in which it was leaning. The foreperson replied confusingly that the vote was "[t]wo to three, and then eleven to twelve." The judge then asked the jury if it was making any progress. The trial transcript indicates "jurors respond," but does not say how. The judge then said, "I'm getting a no." The foreperson replied, "We've got some individuals that are very strongly — that are not moving." The judge sent the jury back out to deliberate further and then told the parties, "If I haven't heard from this jury in 15 or 20 minutes I expect to . . .

---

[1] At the plea in bar hearing, Appellant's counsel represented, without dispute from the State or the trial court, that there was some delay in finding the recording and the machine to play it on and that the jury also took a 20-minute smoking break at some point.

[2] The trial transcript does not reflect these communications between the judge and the deputy, but at the hearing on Appellant's plea in bar, the judge said that the deputy came to his office twice before the judge brought the jury in to see if it was making progress.

either give them an <u>Allen</u> Charge or declare this jury hung."[3] The prosecutor said, "I'd say declare them hung because when you asked the question I saw some pretty violent disagreement and I don't think an <u>Allen</u> Charge is going to clear it." Appellant's counsel replied that there could be potential for an <u>Allen</u> charge. The judge ended the discussion by saying, "I will go ponder on it. I don't know that an <u>Allen</u> Charge is going to do a lot of good here." At this point, the jury had been deliberating for only three hours — not counting breaks and delays — after a four-day trial.

Some time after this discussion, the deputy sheriff apparently went to the judge's office a third time to say that he was still very concerned about what was happening in the jury room. On a fourth and final visit, the deputy said that he thought he would have to go into the jury room because things were "out of hand." The judge told the deputy, "No, we are stopping."[4]

At about 4:40 p.m., the judge told the parties on the record:

---

[3] See <u>Drayton v. State</u>, 297 Ga. 743, 746-748 (778 SE2d 179) (2015) (describing the Georgia pattern jury instruction encouraging further jury deliberations based on <u>Allen v. United States</u>, 164 U. S. 492, 501 (17 SCt 154, 41 LE 528) (1896)).

[4] Again, much of this detail about the deputy's visits was put on the record only at the plea in bar hearing.

All right, I'm going to bring this jury back in and I'm going to make a little bit of a record before we do that. This jury has been down here this week late and has put in more hours probably than most jurors do in a non-holiday week. They've had to sit through quite a few delays while things got ready. It has been reported to me that their discussion in the jury room has become quite contentious and volatile. [The deputy] came in my office and told me, just a few minutes ago, that at one point he thought he was going to have to go in there. . . . I think these people have served above and beyond the call on this case and it was fairly obvious when I brought them in awhile ago and asked them if they were making any progress that they are not making any progress. I am going to declare a mistrial and send this jury home.

The judge then brought the jury into the courtroom and said:

All right, folks, y'all have been at this awhile, I know, and based on the previous conversation with you, it doesn't sound to me like you are really getting very far. You have gone above and beyond the call of duty and you're down here on a Saturday afternoon, nearly five o'clock. From what I'm hearing is that this has become somewhat of a contentious situation. I think that we have asked all that we can ask of y'all at this point and I am going to declare this case a mistrial and send you all home.

Appellant's counsel objected, and the judge sent the jurors back to the jury room so they could speak with the court clerk before going home. The judge then asked what Appellant was objecting to, and his counsel argued that three hours of deliberation was not unreasonable. The judge replied that this was the first time in his experience that a bailiff had expressed concerns that he would

5

need to go into the jury room because of contentious deliberations. Appellant's counsel claimed that the foreperson had said that the jury was making progress 15 minutes ago, but the judge said that he heard one of the jurors say no and saw several jurors indicate no. Appellant's counsel then suggested that the court could have polled the jurors individually to see if they thought they could make progress. The judge replied that he was unfamiliar with that procedure and said, "Your objection is noted, but I'm not going to keep these people in there until they kill one another; I'm just not." The State did not object to the mistrial.

About three weeks later, Appellant filed a plea in bar based on double jeopardy. When a hearing on the matter was finally held more than 20 months later on June 20, 2017, the trial judge said that he declared the mistrial in the interest of juror safety. The judge asserted that he had excused one juror "because of how volatile things were in the jury room" and that "in 30 years . . . that is the only time I have ever seen or heard of a deputy going to the judge and saying, things are so bad in the jury room that I'm fixing to have to go in there." On July 19, 2017, the trial court entered an order denying Appellant's plea in bar, ruling that the mistrial was necessary "in the interest of juror safety." Appellant filed a timely notice of appeal directed to the Court of Appeals, which

6

transferred the case to this Court. The case was docketed to the term beginning in December 2017 and orally argued on February 5, 2018.

2. The Double Jeopardy Clause of the Fifth Amendment, which applies to the states through the Fourteenth Amendment, says "[n]o person shall be . . . subject for the same offence to be twice put in jeopardy of life or limb . . . ." U. S. Const. amend. V. See Benton v. Maryland, 395 U. S. 784, 795-796 (89 SCt 2056, 23 LE2d 707) (1969). One principle underlying this constitutional right is that

> the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

Benton, 395 U. S. at 796 (citation and punctuation omitted). Thus, protection against double jeopardy recognizes "the valued right of a criminally accused, once his jury has been sworn and impaneled and thus jeopardy has attached, to have his trial proceed to acquittal or conviction before that tribunal." Jones v. State, 232 Ga. 324, 326 (206 SE2d 481) (1974).

The trial judge, therefore, "must always temper the decision

whether or not to abort [a] trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate."

Arizona v. Washington, 434 U. S. 497, 514 (98 SCt 824, 54 LE2d 717) (1978) (citation omitted). For these reasons, to avoid barring a second trial, the court may declare a mistrial without a defendant's consent or over his objection only when "taking all the circumstances into consideration, there is a manifest necessity for doing so," which means "a high degree of necessity." Renico v. Lett, 559 U. S. 766, 773-774 (130 SCt 1855, 176 LE2d 678) (2010) (citations and punctuation omitted). See also Harvey v. State, 296 Ga. 823, 830-831 (770 SE2d 840) (2015).[5]

(a) Where, as here, there is no showing of prosecutorial misconduct, a trial court has broad discretion to decide whether to grant a mistrial. See Tubbs

---

[5] At the plea in bar hearing, the trial court asked Appellant's counsel if he had talked to the jurors after the mistrial was declared. Counsel replied that he had, and he learned that the jury was 10 to 2 to acquit Appellant at that point. The parties' impressions that this was the direction the jury was trending were indicated by their reactions to the court's suggestion that an Allen charge might be needed, with Appellant's counsel favoring that step and the prosecutor opposing it. Indeed, having reviewed the record, the evidence of Appellant's guilt presented at trial was not compelling, although it may have been legally sufficient to support guilty verdicts if viewed in the light most favorable to the State. So this is a case where the defendant's interest in having his first trial proceed to a verdict is not merely theoretical.

v. State, 276 Ga. 751, 754-755 (583 SE2d 853) (2003). "A trial judge has acted within his sound discretion in rejecting possible alternatives and in granting a mistrial, if reasonable judges could differ about the proper disposition, even though in a strict, literal sense, the mistrial is not necessary." Id. at 754 (citation and punctuation omitted). There are no mechanical rules based on categories of circumstances that will permit or preclude a retrial. See United States v. Jorn, 400 U. S. 470, 480 (91 SCt 547, 27 LE2d 543) (1971) (plurality opinion). The United States Supreme Court has explained, however, that "[t]he question whether that 'high degree' [of necessity to declare a mistrial] has been reached is answered more easily in some kinds of cases than in others," with the "strictest scrutiny" given to mistrials provoked by a prosecutor to buttress his case and, at the other extreme, "great deference" accorded to decisions to grant a mistrial based on the judge's belief that the jury cannot reach a verdict or that the jury has been biased by improper evidence, argument, or outside influences. See Washington, 434 U. S. at 507-514.

The trial judge "is not required to make explicit findings of 'manifest necessity' nor to 'articulate on the record all the factors which informed the deliberate exercise of his discretion.'" Renico, 559 U. S. at 775 (citation and

9

punctuation omitted). But "the record must show that the trial court actually exercised its discretion." Harvey, 296 Ga. at 832. "For this reason, we have instructed trial courts to 'give careful, deliberate, and studious consideration to whether the circumstances demand a mistrial, with a keen eye toward other, less drastic, alternatives, calling for a recess if necessary and feasible to guard against hasty mistakes.'" Id. (quoting Smith v. State, 263 Ga. 782, 783 (439 SE2d 483) (1994)). If the trial judge fails to conscientiously exercise his "sound discretion" by acting precipitously or irresponsibly in declaring a mistrial, his decision to terminate the trial over the defendant's objection is no longer entitled to the level of deference normally provided by the reviewing court. Washington, 434 U. S. at 514. The trial court need not say "manifest necessity" or articulate all of the findings supporting its declaration of a mistrial, but sufficient justification for the court's ruling must be evident upon review of the record; when the record fails to reveal any circumstances that would clearly necessitate a mistrial or to demonstrate the court's careful and deliberate consideration of the possible double jeopardy consequences, the court's decision to terminate a trial cannot be sustained, and the Double Jeopardy Clause will bar a retrial.

(b)     In this case, there were some indications in the trial transcript that the court granted the mistrial because it believed the jury would be unable to reach a unanimous verdict.  That would have been a dubious decision, as the jury had been engaged in deliberations for less than three hours after a four-day murder trial when the court declared the mistrial and had not clearly expressed itself deadlocked or received an Allen charge.[6]  But that is not the question before us, because at the hearing on Appellant's plea in bar and in its order denying the plea, the trial court stated explicitly that it granted the mistrial solely "in the interest of juror safety."

The first problem with that ruling is that any conclusion that the jurors were or felt unsafe is, at best, only tenuously supported by the record.  In its order, the trial court asserted that it became "imminently concerned for the safety of the jurors . . . after one juror was excused due to the contentious nature of the deliberations."  Nothing in the trial record supports that assertion.  The excused juror's note asking to be replaced by an alternate said only that she was "not in her right mind," and when the court questioned her about whether she

_____

[6] The judge declared the mistrial sua sponte less than 20 minutes after the initial discussion of a possible Allen charge, without further interaction with the jury or mention of that option.  And at the plea in bar hearing, the judge said, "I wouldn't have given them an Allen Charge anyway, because [the jury] . . . never said they were hopelessly deadlocked."

11

was capable of deliberating and returning a verdict, she said that she would not be able to do that because she did not have time to and did not want to "go back and forth about [her] opinion." Neither the court nor counsel asked whether she felt unsafe or intimidated by the other jurors or by anything else, and the juror expressed no such concern. After its brief colloquy with the juror, the court excused her without any reference to the contentiousness of the jury deliberations or to jury safety, and the court did not mention the juror's removal when it explained its reasons for declaring the mistrial at trial, first to the parties and then to the jury.

The other asserted basis for the trial court's concern about juror safety was the deputy sheriff's repeated reports to the court that the jury deliberations were contentious and his final visit to the judge to say that he felt he needed to go into the jury room because things were "out of hand." All of this information — much of which was put on the record only much later at the plea in bar hearing — appears to be based entirely on what the bailiff overheard through closed doors during the jury's deliberations. Even at the end, what the deputy heard was not perceived by him or by the judge as so dire or dangerous as to require immediate intervention; instead, the deputy left the area outside the

12

jury room to consult with the judge in chambers about what he believed were overly contentious deliberations, and the judge then went to the courtroom to tell the parties that he was declaring a mistrial, before bringing the jurors in. The judge did not mention the deputy sheriff's reports to the parties until he was telling them that he had already decided to declare a mistrial. Most significantly, the trial court did nothing to try to confirm the deputy's reports with the jurors by asking if any of them felt the least bit unsafe during their deliberations.

(c) The attenuated factual support for the court's decision to terminate the trial is exacerbated by the court's failure to consider alternatives to declaring the mistrial. As mentioned earlier, this Court has repeatedly emphasized that, before concluding that manifest necessity for a mistrial exists, the trial court should "'give careful, deliberate, and studious consideration to whether the circumstances demand a mistrial, with a keen eye toward other, less drastic, alternatives, calling for a recess if necessary and feasible to guard against hasty mistakes.'" Harvey, 296 Ga. at 832 (quoting Smith, 263 Ga. at 783). See also Haynes v. State, 245 Ga. 817, 819 (268 SE2d 325) (1980) (explaining that, in light of the rule that only manifest necessity justifies a mistrial, "a consideration

13

of alternative remedies is highly important"); Bair v. State, 250 Ga. App. 226, 227 (551 SE2d 84) (2001) ("[I]t is incumbent upon the trial court to consider less drastic alternatives before concluding that a mistrial is warranted."). "[T]he persuasiveness of existing alternatives [will] vary with the fact thought to be reason for a mistrial." Jones, 232 Ga. at 332. Where, as here, the alleged need for a mistrial rests entirely on unconfirmed, indirect reports about the jury's deliberations, the need to consider alternatives is heightened.

There is no indication in the record that the trial court evaluated any alternative less drastic than a mistrial. With regard to whether the jury was making progress in its deliberations, there was discussion of giving an Allen charge, but again, at the plea in bar hearing and in the order denying the plea, the trial court made it clear that the mistrial was not ordered due to a belief that the jury was deadlocked. After the court sprung the mistrial on the parties, Appellant's counsel suggested polling the jurors individually, but the court summarily denied that proposal. The court indicated that it was unfamiliar with that procedure, even though polling jurors is a routine way to determine if they have been improperly influenced or are hopelessly deadlocked before ruling on a mistrial motion. See, e.g., McNair v. State, 296 Ga. 181, 183 (766 SE2d 45)

(2014); Ely v. State, 272 Ga. 418, 420 (529 SE2d 886) (2000); Honester v. State, 336 Ga. App. 166, 171 (784 SE2d 30) (2016).  See also Laguerre v. State, 301 Ga. 122, 123-124 (799 SE2d 736) (2017) (noting that, after an unexpectedly long trial, the court's case manager polled the jurors to determine who had scheduling conflicts and observed a "general feeling of discord" before the court declared a mistrial).

Moreover, there were other obvious alternatives to abruptly declaring a mistrial due to second-hand reports of contentious or even unsafe jury deliberations, such as instructing the jurors to take a break and relax, see United States v. Martin, 63 F3d 1422, 1431 (7th Cir. 1995), overruled on other grounds by Jones v. United States, 529 U. S. 848, 859 (120 SCt 1904, 146 LE2d 902) (2000); sending the jurors home for the day, see Leonard v. State, 275 Ga. App. 667, 668 (621 SE2d 599) (2005); admonishing the jurors to keep their deliberations civil and respectful, see Bost v. United States, 178 A3d 1156, 1204 (D.C. 2018); and determining if a specific juror was responsible for creating the volatile environment and admonishing or removing that juror, see State v. Arnold, 280 Ga. 487, 488-490 (629 SE2d 807) (2006).  The trial court here did none of these things, and there is no indication that it considered such

15

alternatives.

(d)    In its order denying the plea in bar, the trial court acknowledged that "[c]ontentious jury deliberations are not uncommon." Nevertheless, in its determination that a mistrial was necessary to ensure the jurors' safety, the court relied on the deputy sheriff's reports of what he perceived to be heated and volatile deliberations. Contentious jury deliberations, without more, do not establish the manifest necessity required for a constitutionally permissible mistrial. "If heated debate alone were sufficient grounds for mistrial in all criminal cases, the criminal justice system could not function." Cernas v. Hedgpeth, Case No. 1:10-CV-02126-AWI-JLT, 2013 WL 6230329, at *16 (E.D. Cal. Dec. 2, 2013). See also Arnold, 280 Ga. at 490 (noting that "the jury room may be an appropriate place for heated debate"); Bethea v. Commonwealth, 809 SE2d 684, 694 n.12 (Va. App. 2018) ("There is no requirement that a jury arrive at a verdict without discord."); State v. Johnson, Case No. A-1368-14T2, 2017 WL 3027364, at *6 (N.J. Super. Ct. App. Div. July 18, 2017) (explaining that "[j]ury deliberations often become heated, and jurors may place all sorts of pressures on each other in the course of deliberations"); Shotikare v. United States, 779 A2d 335, 346 (D.C. 2001) (finding no abuse of discretion in the trial

16

court's decision not to declare a mistrial but to excuse a juror who threatened bodily harm to other jurors, while noting that "tempers may flare in jury deliberations" but "[c]onscientious jurors work through such problems without outside assistance all the time, and they are expected to do so").

The trial court did not cite in its order, and the State has not identified in its brief, any decision from anywhere in the country in which a mistrial has been granted under circumstances like those presented here.[7] This is not to say that juror safety concerns, when factually supported by the record, could never be a proper ground for a court's decision to terminate a trial prior to the jury reaching a verdict. See State v. Dorsainvil, 89 A3d 584, 609 (N.J. Super. Ct. App. Div. 2014) (holding that the trial court erred in failing to declare a mistrial when a violent physical altercation involving two or three jurors erupted during deliberations and led the other jurors to summon bailiffs to enter the jury room to stop the fight, and the court then allowed the same jurors to continue to

---

[7] In its brief, the State relies primarily upon Laguerre, but the factual basis supporting the mistrial and the trial court's consideration of alternatives clearly distinguish that case from this one. In Laguerre, several jurors raised specific concerns regarding delays in the trial, and the court had its case manager poll the jurors about their schedule conflicts and their reactions to possibly continuing the trial after it had unexpectedly extended into the holidays. See 301 Ga. at 122-124. We held that the trial court, after establishing a sufficient factual basis and carefully considering the only real alternative of a multi-week continuance, did not abuse its discretion in declaring a mistrial and denying the appellant's subsequent plea in bar. See id. at 125-128.

17

deliberate to a verdict).  Even in such exceptional cases, however, the concerns may be resolved by the removal of the juror who poses a threat, and the trial court should address that matter, when possible, before deliberations potentially devolve into brawls.  See Arnold, 280 Ga. at 489-490.  Here, there is no indication that the bailiff overheard anything in the nature of the violent physical fight in the jury room that warranted a mistrial in Dorsainvil — a fight that led the other jurors to seek assistance — and the trial court should have addressed any perceived or developing threats to juror safety, at least in the first instance, by means other than precipitously abridging Appellant's constitutional right to a verdict by the jury that was impaneled and sworn to decide his case.

(e)    For these reasons, the trial court abused its discretion in declaring a mistrial over Appellant's objection, and his plea in bar should have been granted.  Appellant may not be retried, and particularly given the delay between the mistrial and this decision, he should be promptly ordered released from confinement upon the return of the remittitur from this Court.  See Otis v. State, 298 Ga. 544, 545 (782 SE2d 654) (2016) ("'(W)here a mistrial has been improperly declared (over the protest of the accused), the prisoner can not be again tried.'") (citation omitted).

Judgment reversed.  All the Justices concur.

Decided April 16, 2018.

Murder. Bibb Superior Court. Before Judge Simms.

Mark A. Barnes; James W. Davis, for appellant.

K. David Cooke, Jr., District Attorney, John A. Regan, Dorothy V. Hull, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, for appellee.